[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On November 16, 2000, the petitioner, the Commissioner of the Department of Children and Families, ("DCF"), filed a petition pursuant to C.G.S. § 17a-112 et seq. to terminate the parental rights of CT Page 3580 Cynthia C. and Joseph G. to their child Alexandra C. Both respondents contest termination of their parental rights. Trial of this matter took place before this court on November 26 through 29, 2001 at the Regional Child Protection Session at the Middlesex J.D.[1] For the reasons stated below, the court finds in favor of the petitioner.
The sole statutory ground alleged against both respondents was that the child, Alexandra C., was found in a prior proceeding to have been neglected or uncared for and the mother and father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and the needs of the child, they could assume a responsible position in the life of the child (C.G.S. § 17a-112 (j)(3)(B)(i)).
DCF invoked a 96 hour administrative hold on Alexandra shortly after her birth. An Order of Temporary Custody ("OTC") was issued ex parte by the court (Ward, J.) on February 19, 1999, upon allegations that this medically fragile high risk newborn was in immediate physical danger from her surroundings if released into the care of her parents. On the same date, the court (Ward, I.) ordered specific steps for reunification as to both respondents. On March 1, 1999, the court (Ward, J.) sustained the OTC and issued new specific steps for reunification as to respondent mother. On September 15, 1999, after a hearing, the court (Santos, J.) found Alexandra to be uncared for and committed Alexandra to the care and custody of DCF. The court (Santos, I.) again ordered specific steps as to respondent mother. On August 2, 2000, the commitment was extended to September 15, 2001 and the court (Santos, I.) found that further efforts toward reunification were no longer appropriate as to both parents. The commitment was further extended and the child has been maintained in DCF custody pursuant to orders of the court.
The court finds that notice of this proceeding has been provided in accordance with the provisions of the Practice Book. The court further finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the child.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent. . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. CT Page 3581 § 17a-112. In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z., 26 Conn. App. 58, 63, 597 A.2d 842 (1991),cert. denied, 221 Conn. 901 (1992); In re Teresa S., 196 Conn. 18
(1985); Practice Book 33-1 et seq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252, 258 (1984); In re Karrlo K., 44 Conn. Sup. 101, 106
(1994), aff'd, 40 Conn. App. 73 (1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal, (84-AB), 192 Conn. 254, 264 (1984). "Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re Daniel C., 63 Conn. App. 339, 357
(2001). However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether thedegree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." In reStanley D., 61 Conn. App. 224, 230, 763 A.2d 83 (2000) (emphasis in original); see In re Latifa K., 67 Conn. App. 742, 748, ___ A.2d ___
(2002).
If the pleaded ground to terminate is found, the court proceeds to the disposition stage. On disposition, the court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904, aff'd,35 Conn. App. 276, 278, 648 A.2d 881, cert. denied, 231 Conn. 915,648 A.2d 151 (1994); in re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873
(1999); In re Quanitra M., 60 Conn. App. 96, 102, 758 A.2d 863 cert.denied, 255 Conn. 903 (2000). CT Page 3582
I. FACTS
At trial, the petitioner introduced the social study, other documentary evidence, and the testimony of Ms. Van Etten, DCF social worker, Police Officer Glonovsky of the Farmington Police Department, Dr. Richard Sadler, and Dr. Gerson Sternstein. Respondents both testified, along with respondent mother's father, Dr. Kathleen Bradley and Diane Puppalo, and introduced documentary evidence. The child's attorney participated fully, but introduced no exhibits or testimony. The credible evidence admitted at trial supports the following facts by clear and convincing evidence:
Alexandra C. was born on February 1999 at 35 weeks gestation. She was considered somewhat premature and had difficulty feeding. She was considered by Hartford Hospital staff to be a high risk newborn.
Alexandra's mother, Cynthia C., was 27 years old when Alexandra was born. Respondent mother has an extensive history of mental illness and severe psychiatric disorders for which she began receiving psychiatric services at age 13. Prior to Alexandra's birth, she had experienced approximately 20 hospitalizations and had attempted suicide on 10 occasions by overdosing on medications and with crack cocaine. She also reported attempting suicide once by slitting her wrists while she was pregnant with Alexandra C.
At the time of Alexandra's birth, respondent mother was ambivalent about retaining the child. She scheduled and then cancelled visits with an adoption agency. She did not obtain supplies such as formula, diapers or clothing for the infant and failed to develop a plan for the care of her newborn daughter. At the time of Alexandra's birth, respondent mother was diagnosed with major depressive disorder with psychotic features, personality disorder, and an eating disorder. Hartford Hospital staff reported to DCF that the child was in danger of physical neglect. In addition to concerns about both parents' mental health histories, the mother's ambivalence toward the child and the absence of any clothing or supplies for the newborn, hospital staff had been informed by respondent mother that there was a history of domestic violence, including an incident in November 1998 during mother's pregnancy where father had struck her in the head. DCF made a home visit on February 16, 1999 prior to the scheduled discharge of the infant and found no furniture other than mattresses on the floor and no supplies whatsoever for the care of a newborn.
Respondent father, Joseph G., born on September 20, 1969, met respondent mother while they were both receiving psychiatric treatment at John Dempsey Hospital. Respondent father also has a lengthy history of CT Page 3583 mental illness with eight psychiatric hospitalizations beginning at the age of 23. He had been married at the age of 21 and separated at the age of 23. He has two daughters who live with his ex-wife and who have been adopted by their step-father. He has also made a number of suicide attempts by abusing alcohol and medications. In August 1999, a paternity test confirmed a 99.74 010 probability of paternity of Alexandra.
Respondent mother's specific steps, issued March 1, 1999, required the following: that she keep all appointments set by or with DCF; keep her whereabouts known to DCF, her attorney, and the attorney for the child; participate in individual, family and parenting counseling to address treatment goals including parenting an infant, domestic violence, transition to parenthood, and major depressive disorder; accept and cooperate with in-home support services; submit to substance abuse assessment; follow the recommendations of service providers specifically including the Institute of Living and Birth to Three; sign releases; secure and maintain adequate housing, including furniture and supplies for the child; no substance abuse; immediately advise DCF of any changes in the composition of the household; visit the child as often as DCF permits; and get a pediatrician. Ex. 11. The specific steps issued October 5, 1999 contained the same requirements but added counseling for anger management and added as recommended service providers "Institute of Living or similar program," VNA, and the Department of Mental Health and required that she follow through with medication as recommended and follow through with the recommendations of a psychological evaluation. These steps also required that respondent mother have no further involvement with the criminal justice system.[2] Ex. 12.
As of the adjudicative date (November 16 2000), respondent mother had complied with some of the steps but had failed to comply with many of them. According to the testimony of Ms. Van Etten, respondent mother did not keep all appointments set by or with DCF. DCF referred respondent mother to Wheeler Clinic which in turn referred her to Community Mental Health Affiliates. A referral was made to Intercommunity Health in May, 1999 and respondent mother did not attend. She was hospitalized in June, 1999 and thereafter was in therapy with Marion Kelly of Grove Hill Medical Center and followed by her treating psychiatrist, Dr. Gerson Sterstein. DCF referred respondent mother to Prudence Crandall for services to address domestic violence issues and she did not follow through with that referral, although domestic violence issues in her relationship with respondent father were a part of her individual therapy with Grove Hill. Although DCF referred mother to the Department of Mental Health, she did not follow through. As of November 16, 2000, respondent mother had not completed any parenting course or any course designed to help her address transition to parenthood. DCF referred respondent mother to the YWCA for parenting education classes. She attended one group CT Page 3584 session through the YWCA, but stopped attending because it was not designed to address individuals with mental health issues. She later did participate with the Visiting Nurses Association in their parent aide program beginning in July, 2000 and she and respondent father were discharged from the program in February 2001, approximately three months after the termination petition was filed.[3] As of November 16, 2000, respondent mother had not completed any course designed to help her address domestic violence. She also did not complete any program designed to address anger management. Respondent mother on one occasion threatened the first social worker assigned to this case. Although the specific steps required that Ms. C. have no further involvement with the criminal justice system, she was arrested on November 27, 2000 following a domestic violence incident with respondent father. Thus, in the 19 months following her daughter's birth, respondent mother did not meet many of the specific steps. She did visit Alexandra regularly for the last five months prior to the filing of the termination petition. The DCF narratives of the visits and the testimony reflect that although initially respondent mother was very hesitant and cautious around her daughter even after she had visited regularly, ultimately she became much more comfortable with Alexandra and the visits became enjoyable for mother and daughter. As of July 31, 2000, she was living in a nicely furnished apartment which she had set up with supplies and toys to accommodate a child.
Respondent father's specific steps required him to do the following: keep all appointments set by or with DCF; keep his whereabouts known to DCF, his attorney, and the attorney for the child; participate in individual, family and parenting counseling; accept and cooperate with in-home support services; sign releases; secure and maintain adequate housing; have no further involvement with the criminal justice system; immediately advise DCF of any changes in the composition of the household; maintain the child in the State of Connecticut; and visit the child as often as DCF permits. Ex. 13.
Respondent father was inpatient at the Institute of Living from April 6, 1999 through April 14, 1999.[4] He participated in the Institute of Living Partial Hospitalization Program from April 15, 1999 through June 16, 1999 and in the Intensive Outpatient Program from June 16, 1999 through October 13, 1999. He participated in individual and group therapy counseling as part of those programs. A protective order was in effect from June 1999 through August 1999 as a result of a domestic violence incident with respondent mother. He continued to see his therapist, Diane Puppalo, until May 2001 at which time he stopped seeing her and stopped taking his medication.
Respondent father failed to visit Alexandra regularly until she was CT Page 3585 more than 15 months old. Although he visited her on only a few occasions prior to that date, on May 31, 2000, he began to visit her regularly. He was very comfortable with Alexandra, initiating interaction with her and caring for her including changing diapers, feeding her and cleaning her face. As of July 31, 2000, he had moved in with respondent mother. He was also arrested on November 27, 2000. Thus as set forth above, he met some, but not all of the requirements of the specific steps.
The termination of parental rights petition was filed on November 16, 2000. Shortly thereafter, on November 27, 2000, the respondents were arrested in connection with a domestic violence incident at the home they shared. The incident arose following notification to respondents that the termination petition had been filed. During the argument, respondent father repeatedly hit respondent mother who ultimately got a knife from the kitchen and threatened him with it. He took the knife away from her and held it to her throat. She called 911 and the police responded. Both respondents were arrested.
Alexandra has been in her current foster home since September 15, 2000. She is happy and very well adjusted in her foster home. Her foster family loves her and wishes to adopt her. She calls her foster parents Da-Da and Mommy. Her foster parents are committed to her and her foster mother took a period of leave from her job in order to care for Alexandra when she was initially placed in their home. She has now resumed working two times a week. Alexandra is enrolled in a preschool program. She was seen through the Birth to Three program for evaluation. Although Alexandra had many developmental delays at birth, including difficulty feeding, she was discharged successfully from the Birth to Three program in April 2001 with only minor delays in two areas.
1. Testimony of Richard B. Sadler, M.D.
On July 19, 1999, Richard B. Sadler, M.D., conducted a competency evaluation of respondent mother. Although Dr. Sadler found respondent mother to be competent to stand trial, he did offer the prediction, based upon her reported history, that she might not remain competent in view of "the previous numbers of psychiatric hospitalizations, at approximately one per year on average." Ex. 2 at p. 8.
Dr. Sadler performed two subsequent psychiatric evaluations of respondent mother and respondent father and an interactional evaluation with Alexandra and both parents. He concluded both times that neither respondent mother or father were in a position to care for the child. Dr. Sadler testified credibly that although both respondents had made significant improvements and strides toward managing their own lives by the time of the second evaluation, they were nevertheless still not in a CT Page 3586 position to care for the child.
A. The May 13, 2000 Evaluation
In his report of May 13, 2000, Dr. Sadler indicated that respondent father had reported to him that he was first hospitalized at age 23 and had had approximately eight hospitalizations. He reportedly attempted suicide on three or four occasions. His diagnoses included obsessive-compulsive disorder, a major depressive disorder and a bipolar disorder. He reported that he intentionally cut himself and that he and respondent mother had assaulted each other on numerous occasions. He was taking psychoactive medications including Trazodone, Luvox and Risperdal. Respondent father stated during the interview with Dr. Sadler that he had been arrested three or four times as a result of physical altercations with respondent mother. Respondent father described symptoms to Dr. Sadler which supported the reported diagnosis of obsessive compulsive disorder. Specifically, respondent father expressed that he has a compulsion to touch or dispose of articles in a ritualistic manner. He described his depression as leading to lethargy, increased sleep and procrastination. He specifically included "letting things go" and not making his therapeutic appointments and not caring for himself Respondent father reported that he had been prescribed numerous medications including Prozac, Zoloft, Luvox, Anafranil, Lithiuma and Risperdal, all of which were unhelpful.
While respondent father assessed himself as having an intuition to know how to take of children which he gained as a result of caring for his two older daughters, he expressed concern that respondent mother did not have this intuition. He did not express confidence that she would be able to call for help if she had a question regarding child care. During this evaluation, respondent father acknowledged that he was not able to care for Alexandra. He told Dr. Sadler that he thought he would be ready to care for his daughter in another six months, but then added, "maybe I would need longer." In the interactional evaluation, Dr. Sadler found respondent father to interact with Alexandra in a pleasant and competent manner.
Dr. Sadler concluded in May 2000 that respondent mother was not able to address or identify the personality, emotional and interpersonal difficulties causing her judgment impairments and organizational impairments which led to her inability to care for her child. He wrote: "At the end of this evaluation, in my opinion, Ms. C. has given some suggestion that she is functioning in a somewhat more stable manner at this time than she has demonstrated in the past. However, Ms. C. has not corrected and she has not demonstrated substantial indications of beginning to meaningfully correct the problems that led to her inability CT Page 3587 to care for her daughter at the time of her daughter's birth." Id. at pp. 12-13. She acknowledged to Dr. Sadler that she had missed 10-15 of a possible 32 visits with Alexandra, in part because she was sick. She also acknowledged an eating disorder. The nature of the interaction between Alexandra and respondent mother was considered to be "positive, attentive, pleasantly interactive and settled enjoyment," according to Dr. Sadler. Dr. Sadler concluded:
 Ms. C. is a severely psychiatrically disturbed woman who has functioned in an erratic and unstable manner for her entire adult lifetime. Ms. C. has not been able to establish any consistent or functional relationship and Ms. C. has not been able to develop an ongoing relationship with her daughter. Ms. C. has not demonstrated concrete indications of making changes in her lifestyle or functional abilities that would suggest that at some time within a time frame that would not be severely detrimental to her daughter's development, that Ms. C. would be able to adequately care for a child.
 Ms. C. describes a wide variety of psychiatric symptoms that have suggested a wide variety of psychiatric diagnoses over the years. Most parsimoniously, Ms. C. demonstrates the full diagnostic criteria of a Borderline Personality Disorder and the associated conditions of an Anxiety Disorder and Depressive Disorder which are believed to result from the distress from the effects of her impaired judgment and her erratic interpersonal relationships.
 Ms. C. does not demonstrate increasing insight into the nature of her psychiatric impairments. Ms. C. is currently actively and vigorously offering either physical or external explanations for her own internal disarray and her impaired judgment. Ex. 3 at p. 19.
Regarding the abilities of both respondents to parent Alexandra, Dr. Sadler made several conclusions:
Neither parent has been able to conform their own adult behaviors to support Alexandra or to be able to address the needs of Alexandra. These parenting failures began prior to Alexandra's birth as indicated by delayed prenatal visits and parental ambivalence CT Page 3588 regarding raising Alexandra at all. Both parents failed to prepare to care for Alexandra. Once removed from both parent's care, neither parent established a consistent or conscientious program to address the deficits which led to Alexandra's original placement. At this time, in my opinion, neither parent has demonstrated indications that they have achieved a degree of stability that would allow either parent or the parents together to achieve sufficient stability in order to adequately raise a child. Id. at p. 20.
"Neither parent has established themselves, over the past 15 months, as a substantial part of Alexandra's life." Id. at p. 20 Further, Dr. Sadler concluded "Ms. C. has not demonstrated an ability to care for her child and take care of herself at the same time." Id. at p. 21.
Mr. G. had been even less involved than Ms. C. in Alexandra's life at the time of this evaluation and Dr. Sadler concluded: "While Mr. G. may demonstrate better judgment and more functional interpersonal abilities, he is also seriously psychiatrically impaired and he has not demonstrated an ability to even visit on a regular basis with his daughter. Id. In conclusion, Dr. Sadler writes: ". . . Alexandra would not be able to be adequately cared for by either of her parents, either singly or together." Id. He also opined that "no intervention would be likely to achieve such rehabilitation for either parent that they would be able to offer better care for Alexandra within a time frame that would not be severely detrimental to Alexandra's ability to successfully bond with and form a relationship with the adult or adults who will raise her into an age of independence. Id. As of May 2000, Dr. Sadler noted, "Both parents have been involved with counseling for many years and neither parent has shown an ability to substantially stabilize their own life. Id.
B. The April 14, 2001 Evaluation
Dr. Sadler conducted an updated psychiatric evaluation and a competency evaluation of both respondents on April 14, 2001, approximately five months after the termination petition was filed.
By time of this evaluation, Dr. Sadler found both respondents to have made significant improvements with regard to their own mental health and well being.[5] Specifically, regarding respondent mother, he observed that although Ms. C.'s judgment remained identifiably impaired, she demonstrated none of the thinking disorganization he had observed in May 2000. Although he found that "[o]n many occasions Ms. C. responded in a more direct, specific and functional manner regarding her assessment of Alexandra's needs . . ., [she] continued to describe Alexandra more in CT Page 3589 terms of how Alexandra will affect Ms. C. rather than what Alexandra's specific or individual needs may be." Ex. 4 at p. 4. Respondent mother acknowledged during the evaluation that she continued to have issues surrounding domestic disputes with respondent father and informed Dr. Sadler that although the two were living together, they both had "partial restraining orders" stating that they are ordered not to harass one another. Id. at p. 5. Also during the evaluation, Ms. C. informed Dr. Sadler that she hears "hallucinated voices that are derogatory." Id. She indicated that the voices may call her names or swear at her and that "she experiences them as being so vivid that she opens the door to check to see who is there." Id. According to Dr. Sadler's report, "[She] continued to note symptoms of Obsessive-Compulsive Disorder, but reported that Prozac helped her with her OCD experiences. She stated that it helped her to clean more appropriately and to feel more comfortable with the cleanliness of her house. . . . She also reported that her appetite and control of her eating had been without problem." Id.
Although Dr. Sadler found Ms. C. to be functioning in a substantially more coherent and better organized manner when compared to his prior evaluation, he also found that Ms. C. continued to describe experiences of deterioration in her mental and emotional abilities at times. Id. at p. 9. However, "these times of deterioration have become less frequent and less intense and have not led to self-injury or hospitalizations in the past year. Ms. C. continues to demonstrate the full symptom complex of a Borderline Personality Disorder as well as the symptoms of an Anxiety Disorder and Mood Disorder." Id. He further concluded that the psychotic symptoms Ms. C. reported "do not occur in the context of mood disturbances nor are there descriptions of Ms. C. demonstrating significant or ongoing impairment in her functional abilities while she is experiencing hallucinated voices. Ms. C. would not be considered to have a psychotic disorder at this time, although there are psychotic symptoms described by her that appear to be quite circumscribed." Id.
Regarding respondent father, Dr. Sadler concluded: "I find Mr. G. to be functioning in a substantially improved manner as compared to his evaluation in May of 2000. Mr. G. convincingly describes, in balanced and thoughtful terms, improvements in nearly every area of his functioning. Mr. G. appears to be well engaged in his individual psychotherapy and to be reliably and comfortably taking his currently prescribed medications."Id. at 10. Dr. Sadler observed that Mr. G.'s control of his angry outbursts was improving and that he continued to be involved in appropriate therapeutic interventions. Id. Dr. Sadler concluded that Mr. C. continued to demonstrate anxiety symptoms and Obsessive-Compulsive Disorder symptoms, but found his Depressive Disorder symptoms to "appear to be largely in remission." Id. CT Page 3590
At trial, Dr. Sadler addressed the improvements demonstrated by both respondents. He acknowledged that the gains both respondents had made exceeded his predictions. He nevertheless concluded, however, that neither respondent had demonstrated an ability to adequately parent Alexandra and to play a constructive role in a day to day parenting function. He testified "Ms. C.'s personal abilities to raise another person, to care for another person, I believe are severely limited. And I think it's unlikely within a reasonable time frame from Alexandra's point of view to hope that Ms. C. would be able to develop parenting abilities for a child." Tr. Nov. 27, 2001 at pp. 11-12. He testified that as of April 14, 2001, he concluded that Mr. G. too "was not capable of playing a day to day constructive role in Alexandra's life." Id. at p. 16. Dr. Sadler expressed his strong belief that Alexandra needed permanency. He stated that Alexandra needs a permanent responsible caretaker and that she needs it at this age and "as soon as it is possible to provide that for her." Id. at p. 17.
2. Testimony of Dr. Sternstein
Respondent mother's treating physician, Gerson Sternstein, M.D., testified regarding his treatment of Ms. C. beginning with her psychiatric admission to New Britain General Hospital in June, 1999. His diagnoses at the time of her admission included major depression, severe, with recurrent psychotic features, post traumatic stress disorder. Upon her admission, she stated that she had been in an abusive relationship for six years, with an individual who was mentally, physically and sexually abusive to her. She had presented to the emergency room after an altercation with her boyfriend, Mr. G. After one week of hospitalization, she was discharged with the diagnoses of schizoaffective disorder and post traumatic stress disorder. At trial, Dr. Sternstein described Ms. C.'s diagnoses as (1) major depression recurrent, in remission, which, at its worst would be categorized as severe; (2) post-traumatic stress disorder; and (3) generalized anxiety disorder. Tr. 11-27-01 at p. 38. Ms. C. had been stabilized on a medication regimen of Prozac and Klonopin, an agent with anti-anxiety and mood stabilizing properties. He testified that Ms. C.'s mental health condition should be viewed as a lifelong or chronic condition. He indicated that a likelihood of a relapse would be 900/a if she were out of treatment. He stated that relapse can be triggered by stressors which makes continued treatment important. He stated that the return of her child to her "would raise the stress exponentially." Id. at p. 42. Dr. Sternstein expressed quite candidly that he had concerns about Ms. C.'s abilities to care for a three year child.[6] His concerns (in the absence of a demonstrated ability) included tolerance for frustration and negotiating ability with a partner to manage the spiritual, disciplinary, health and educational needs of a child. He also expressed concern about an exacerbation of CT Page 3591 symptoms, while at the same time indicating that as her treating physician, he would hope to manage symptoms and help prevent a psychiatric relapse. He also candidly acknowledged that this case would include managing a child who had been taken from an established setting which would be "an additional task that's above and beyond just taking care of a three year old under normal circumstances." Tr. at p. 44.[7] While he viewed Ms. C. as a fairly reliable reporter of symptoms, he acknowledged that although she had reported hearing hallucinatory voices to Dr. Sadler, she failed to report them to him during treatment. He testified that Ms. C. was in a much more stable situation than she had been in when he first met her in connection with her hospitalization in June, 1999; he had no concerns about her ability to reach out for help if she needs it; that he saw Ms. C. as willing and able to manage her illness; and that he was "pretty comfortable" about her ability to manage her own life. Id. at p. 59.
With regard to domestic violence issues, he stated that "a focus of her therapies has been around [Ms. C.'s] abilities to keep herself safe, to maintain appropriate boundaries around her relationship with Joe so that if Joe is doing what he needs to do to stay safe and healthy and to maintain a healthy relationship, then that's one thing. But if he's not able to do that, that she not fall back into the pattern of allowing herself I to be in unsafe situations."[8] Id. at p. 64. He also stated that although domestic violence was being addressed in her individual and group counseling, it was not a formal domestic violence program and was not a substitute for a formal domestic violence program. He acknowledged that the incident wherein a knife was branded on November 27, 2000, after the TPR petition was filed, was a significant safety concern. Id. at p. 70. He conceded that this incident occurred almost a year and half after Ms. C. had been in treatment with him. Id.
Thus Dr. Sternstein recognized that (1) Ms. C. had a violent history with Joe in the home; (2) that there was a significant incident with a weapon on 11/27/00; (3) Ms. C. recognized the negative impact that Mr. G. plays in her life as far as domestic violence and unpredictability if he is not in treatment. Although Dr. Sternstein originally testified that he had no concerns about Ms. C.'s safety, (Id. at p. 58), he later acknowledged that there was a concern for Ms. C.'s safety in view of her volatile relationship with Mr. G. Id. at p. 73.
3. Testimony of Diane Puppalo
Respondent father's therapist, Diane Puppalo, an Advanced Practice Registered Nurse at the Institute of Living, testified regarding her treatment of respondent father. Ms. Puppalo first met Joe G. when he was in the day program at the Institute of Living and needed outpatient CT Page 3592 services. Respondent father had entered the hospital inpatient in April 1999. Although he had seen Ms. Puppalo briefly previously, he began a lengthy period of treatment with her which extended from October 1999 through May 2001, with one three to four month lapse. His diagnosis of a bipolar disorder, obsessive compulsive disorder, and psychotic disorder not otherwise specified, remained the same throughout the treatment period. The goals of treatment were to stabilize his symptoms to increase his level of coping, increase his level of functioning and provide more support for him. She saw him individually every one or two weeks and managed his medication. Although Ms. Puppalo thought respondent father had made progress in his treatment with her, in May 2001, he missed an appointment and she had not seen for six months at the time of trial. Prior to his cessation of treatment, (without having been discharged), he was taking Risperdal to help with his psychotic disorder and Celexa for his obsessive compulsive disorder. The result of stopping the medication would be recurrence of those symptoms in her view. During the treatment period which he ended abruptly, respondent father had shown to her an ability to make a positive change and a desire to do so.
4. Testimony of Kathleen Bradley, PhD
Respondents called Kathleen Bradley, PhD, to testify concerning a Parent Support Assessment she performed regarding the ability of the respondents to parent Alexandra. Dr. Bradley discussed her review of the literature regarding how mental illness in a parent effects the parent-child relationship and efforts to predict successful outcomes. Although it is difficult from the literature to determine or predict success, according to her testimony, there are certain "absolutes." Tr. at p. 44. She stated "I think the absolutes are active substance abuse, noncompliance with medical regimes, not taking your medications, not going to therapy appointments, domestic violence. And that combination in together of people that are actively practicing it, that cluster of negative characteristics, would probably impact more severely on the success of a child in that situation." Id. She testified that "the evidence for success is based upon the individual's desire, first of all, motivation, really desire to get well. And to follow the [advice] of the people who are providing their counseling. To follow their medical routines, to engage in their therapy. To receive the counseling they need to address. And also, to acknowledge that there are issues that they need to deal with in a pretty open and honest manner." Id. at p. 44-45.
Dr. Bradley used several diagnostic tools in evaluating the parenting skills of respondents including "Betty Caldwell's Home Inventory" (an assessment of maternal/child interactions that has been used extensively with women who have experienced mental health issues), the Parent/Caregiver Involvement Scale, the Parent Behavior Progression CT Page 3593 Chart, (assessing infant/parent attachment), and Parent Need Support Scale. Dr. Bradley also conducted 11 hours of interviews with respondents over the course of six visits and had respondents fill out the Ages and Stages Questionnaire to evaluate what the parents had learned during their interactions with their daughter at certain stages of development. She conducted a Mullen Early Learning Screening on Alexandra and visited her in her foster home. Dr. Bradley also provided parenting instruction to respondents during the course of her evaluation.
Dr. Bradley's findings and conclusions are set forth in Respondent's Exhibit G. She found that respondent mother made "some tremendous progress" from the initial (March 2001) session through July 2001 when her evaluation was completed. Id. at p. 55. Dr. Bradley found Ms. C. was motivated to learn and did learn from the parenting instruction she provided. Dr. Bradley found the quality and appropriateness of their interactions with Alexandra to be generally very good, with Ms. C. making very significant progress during the course of the evaluation. She found that respondent father's parenting skills were at a pretty high level even before her evaluation and instruction
On the Parent Needs Scale, she identified no items that required daily support. There were areas that required weekly support, primarily in the area of intellectual or cognitive stimulation, including both fine and gross motor skills, language development, social development and emotional health. Dr. Bradley also identified as a critical need the issue of nutrition in view of respondent mother's eating disorder since "children learn their eating patterns from their parents." Id. at p. 66. In sum, Dr. Bradley stated:
 . . . I really do believe that these parents can participate in a targeted intervention . . . designed to have Alexandra returned to their care. I think that the intervention should be very specific and very articulately planned.
They should continue to receive the individual counseling that they are receiving. They need to continue with all their medications and all their therapeutic interventions. They can't skip any of their appointments. They really need that weekly support that they're receiving in their individual counseling. I think that they need to resolve any domestic violence issues, including the arguing. 1 think that they're already working on this. . . . I think that couples counseling about that particular issue would be important because then they could get CT Page 3594 to the bottom of why — what it is that causes those arguments to surface and then what specific things — they already have in place some strategies that they're using, which are good strategies. But I just think that knowing more about why that happens is a good preventative tool. ***
 . . . If they can find a support group or a parent/child play group through a mental health agency, that might be a better avenue for them to learn some of these parenting skills in a triadic situation with their daughter. Id. at p. 67.
Dr. Bradley concluded that "If all the recommendations are implemented and the parents do very, very well and are very consistent with the recommendations prescribed and you can find these services, I can see reunification in six months." Id. at p. 69.
Dr. Bradley also observed Alexandra with her foster family and found that the home is meeting all of Alexandra's needs, that Alexandra is well cared for and that she has a parent child relationship with her foster parents whom she calls mommy and daddy. Id. at p. 76. Dr. Bradley also testified that Alexandra had a good attachment with her parents, that she was a resilient child,[9] and one who was able to attach to multiple caregivers.
Significantly, Dr. Bradley testified credibly that she could not recommend that Alexandra go home unless both parents complied with the medications and the psychiatric recommendations. She also indicated that in view of respondent father's noncompliance with therapy and medications, an initial four months of monitoring compliance would be necessary before implementing any plan toward reunification.[10] If there were four months of complete compliance, then an additional six months of gradually increasing visitation, during which respondents followed all of her recommendations, should take place before reunification could occur. Id. at p. 86. Dr. Bradley agreed that Alexandra needs to have permanency "very soon." Id. at p. 85.
6. Testimony of Respondent Mother
Respondent mother testified that she loves Alexandra and wants to care for her. She described the efforts she made to prepare a room for Alexandra at her home and provided photographs depicting the room and the items she had arranged for Alexandra. CT Page 3595
Respondent mother admitted to having failed to visit regularly with Alexandra until Alexandra was well over a year old. She admitted that she told DCF that she did not want to visit with Alexandra until Joe stopped visiting with Alexandra. Ms. C. stated that her failure to visit regularly prior to May 2000 was, in part, due to postpartum depression. "After having A., my depression got worse. And I do suffer from depression right now, but I am currently taking my medication and I am working." Id. at p. 106.
With regard to specific steps issued by the court, respondent mother conceded that she failed to keep all appointments set by DCF, at least up until May 2000. She acknowledged that her visits were very inconsistent between February and September, 1999. There was one initial visit on February 23, 1999 and then only two visits between February and September, 1999 at the time Alexandra was adjudicated uncared for. She hospitalized herself in June, 1 999. Also during this time, DCF referred respondent mother for parenting classes, but she failed to attend. An intake appointment was also made for her to community mental health services, but she failed to follow through with this service as well. She had numerous transportation problems which affected her ability to avail herself of some of the services offered. She acknowledged that she had been referred by DCF to Prudence Crandall for domestic violence counseling, but did not attend.
As of November 16, 2000, the adjudicatory date, respondent mother had participated in the VNA parent aide program, but had not successfully completed any course of counseling to address parenting abilities. She acknowledged that there were a lot of missed appointments. She also had not engaged in any formal program to help her address domestic violence issues, but had been engaged in individual therapy, was taking her medication regularly and addressing her mental health issues.
Respondent mother acknowledged her long standing history of physical and emotional abuse from Joe. She testified regarding the November 27, 2000 domestic violence incident as follows:
A: And Joe and I had been going back and forth because, prior to that, we received in the mail the TPR. And it's always in separate envelopes. And it just escalated to a level that — [. . .] I was in the kitchen. Joe's macaroni and cheese was ready. And we were still fighting, but I was trying to tell him that his dinner was ready. [. . .] I had moved into the kitchen because there was a physical fight in the other room. [. . .] He came running into the kitchen. I was fed up with it and I was tired of being CT Page 3596 hit on the head all the time.
Q: And what was the purpose of the knife?
A: Just to scare him.
Q: You didn't have any other intent or —
A: No. I've picked up furniture to block him away from me.
Q: Now, did you come —
A: I tried to learn —
Q: to a point where you called for help?
 A: Yeah. When he put it [the knife] to me. Yeah, I did. Because he was still screaming and hollering.
Q: How did you call for help?
A: I went to the telephone.
Q: And what did you do?
 A: I was upset and I called 911. I was in hysterics. I can't really tell you what I said because 1 was in hysterics.
Respondent mother called DCF worker Van Etten after this incident and Ms. Van Etten again referred her to Prudence Crandall for domestic violence counseling. Respondent mother did not follow through.
7. Testimony of Respondent Father
Respondent father conceded that between February 1999 when Alexandra was born, until May 2000, he did not visit her. He also conceded that he had never completed any class that would help him address anger management, but was waiting to get into one and he intended to participate. He and respondent mother were required to take anger management counseling by the criminal court after their arrests on November 27, 2000 on the domestic violence charges, and they were still on the waiting list for those services. Respondent father collects disability based on his mental health. Respondent father works part time at CVS and is not able to work full time in part because of his depression. Respondent father agreed that he had not completed a domestic CT Page 3597 violence program and at the time of trial was not in compliance with individual counseling. He testified that he stopped participating in individual therapy in April 2001 and that he stopped taking his medications shortly thereafter. He stated that he stopped seeing his therapist, Ms. Puppalo, because he learned that she had a serious illness and he did not know how to react. He indicated that he was planning to be gin seeing her again. He also stated that he had a previous time period of about three months where he had stopped seeing her and after three months decided on his own that he needed to go back to her and he did. Tr. 11/28/01 at p. 4.
Respondent father explained his failure to visit with Alexandra for the first year and a half of her life as the result of his depressive disorder and obsessive compulsive disorder. He stated that he was not doing well at the time and that he felt it might not be best for Alexandra "to be dragged along for that ride." Id. at p. 35. He stated that he thought it was important that he get himself better first, which he attempted to do. After his condition improved, he felt it was appropriate to start visitation with Alexandra. He stated that he took part in a parenting group while at the partial hospitalization program at the Institute of Living. He also participated in the VNA parent aide program at their home, and achieved moderate success although the discharge reflects that they were discharged from the program with "goals unmet." Ex. 14. He and respondent mother are planning to marry. He loves Alexandra and would like to care for her. He stated that he did not expect Alexandra to be returned to him at least for another six months, maybe more. Tr. 11/28/01 at p. 32. Respondent father admitted that he was currently taking no medication and was not in individual therapy.
John C., father of respondent mother, testified regarding his availability to provide support to Ms. C. if she needed it. While stating that he would be available to provide support for his daughter and granddaughter, he acknowledged that he did not come forward as a resource when Alexandra was born because it was not expedient at that time.
II. ADJUDICATION
The only ground alleged in the petition as to both respondents is parental failure to rehabilitate. The petitioner is required to prove this ground by clear and convincing evidence. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992).
A. Location and Reunification § 17a-112 (i)(1):
In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts CT Page 3598 to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." C.G.S. § 17a-112 (j)(1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted; citation omitted.) In re Mariah S.,61 Conn. App. 248, 255, 763 A.2d 71 (2000).
DCF made substantial efforts to reunify in this case. Numerous referrals were made for services from the time of Alexandra's birth. Visitation was provided and facilitated on a regular basis despite many transportation problems.
The court (Santos, J.) made a finding on August 2, 2000 that further efforts to reunify Alexandra with both respondent mother and father were no longer appropriate. Under the statute, a finding that reasonable efforts were made is not required if the court has determined, as in this case, that reasonable efforts are no longer appropriate. 17 C.G.S. § 112(j)(1); In re Gary B., 66 Conn. App. 286, 290-91, 784 A.2d 412
(2001). Nevertheless, after this finding was made, DCF continued to facilitate visitation and continued to provide referrals for respondents. For example, in November 2000, after the domestic violence incident in which both respondents were arrested, (and after the termination petition had been filed) DCF social worker Van Etten again referred respondent mother to Prudence Crandall for domestic violence counseling. Throughout the case, numerous referrals were made to service providers who could help respondents address the issues that led to the removal of their daughter. In short, DCF made reasonable efforts to reunify in this case. Counsel for respondents argue that reasonable efforts were not made because DCF did not provide home visits for respondents with Alexandra. In the absence of the completion of parenting and domestic violence classes, it was reasonable for DCF to conduct the supervised visitation at other locations.
B. Parental Failure to Rehabilitate- § 17a-112 (i)(3)(B)(i)
The petitioner alleges that respondent mother and father's parental rights should be terminated because they have failed to achieve rehabilitation within the meaning 17a-112 (j)(3)(B).[11] Respondents counter that they have made sufficient progress in rehabilitation to make it reasonably foreseeable that they will be able to resume a responsible role in Alexandra's life. As Alexandra was found to be uncared for on September 15, 1999, the critical issue for this court is whether the CT Page 3599 respondents have achieved rehabilitation sufficient to render them able to care for Alexandra. Construing the statute in compliance with the mandate of § 17a-112 (p),[12] the court finds this issue in favor of the petitioner.
"`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court . . . to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that [within a reasonable time] she can assume a responsible position in her child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In reShyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)]." In re SarahAnn K., 57 Conn. App. 441, 448, 749 A.2d 77 (2000). See also In re AshleyS., 61 Conn. App. 658, 665, 769 A.2d 718, cert. denied, 255 Conn. 950
(2001); In re Amneris P., 66 Conn. App. 377, 384-85, 784 A.2d 457
(2000).
The court finds by clear and convincing evidence that respondents have yet to achieve a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in Alexandra's life. See In re Daniel C., 63 Conn. App. 354; In re Ashley S.,61 Conn. App. at 665;In re Sarah Ann K., 57 Conn. App. at 448. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks and citation omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496 (1999). The psychological evidence in this case clearly establishes that neither parent has achieved § 17a-112 (j)(3)(B) rehabilitation. Dr. Sadler was unequivocal in his opinion that neither respondent could provide day to day care for Alexandra. He reached this opinion even while acknowledging that both respondents had made great progress in managing their own lives, contrary to his expectations. Dr. Sadler's testimony reflected the remarkable progress both respondents made considering the severity of their impairments at the 1time of Alexandra's birth. Dr. Sadler's description of the progress made by Mr. G. included that he was "well engaged in his individual psychotherapy and . . . reliably and comfortably taking his currently prescribed medications." Ex. 4 at p. 10. The testimony of Ms. Puppalo as well as respondent himself clearly establish that this was no longer true at the time of trial. Nevertheless, making extraordinary progress in managing their own lives, CT Page 3600 however, does not establish that they can manage Alexandra's life. Dr. Sadler stated that in his view they could not do so, and that it was unlikely within a reasonable time frame from Alexandra's point of view that they would be in a position to parent Alexandra whom he described as needing permanency "as soon as possible."
Dr. Sternstein also expressed concerns about respondent mother's abilities to care for a three year old and the additional "exponential" stress that she would be under. Although he felt he could manage her psychiatric illness and he praised her ability to recognize when she needs help and her willingness to seek it, he also acknowledged that she had failed to report to him that she had been hearing hallucinated voices. He clearly questioned her ability to care for a three year old child on a day-to-day basis. Even respondent's expert, Dr. Kathleen Bradley, agreed that both respondents were not, at the time of trial, in a position to provide day-to-day care for Alexandra. With respondent father out of therapy and not taking medication, Dr. Bradley ultimately concluded that under the best of circumstances, she could see the possibility of reunification in 10 months at the earliest.
Further, although specific steps were issued to assist respondents in achieving rehabilitation, the evidence clearly and convincingly indicates that they failed to fulfill them in a number of significant measures. As described above, respondents had not participated in a domestic violence or anger management program despite a lengthy period of time which do so. Although they were on waiting list for these services as a result of the criminal charges, respondents could have obtained the services prior to the criminal case or through another source.[13] The court recognizes that respondent father's specific steps did not require domestic violence counseling. They did, however, require individual and family counseling with which he was not in compliance. At the time of trial, respondent father was not in treatment, having stopped therapy on his own in April 2001, and was not taking medication. Both respondents had further involvement with the criminal justice system in an incident which raised serious safety concerns.
The court concludes by clear and convincing evidence, that as of the adjudicatory date, respondents had not brought themselves into a position in which they could provide adequate care for Alexandra. The testimony of Dr. Sadler, Dr. Sternstein and Dr. Bradley all support this conclusion. Dr. Sadler's evaluations showed that as of the adjudicatory date, the respondents were not in a position to care for Alexandra.[14] Dr. Sternstein indicated that as of the time of trial after treating respondent mother since June, 1999, he could not make any predictions about how it would turn out if reunification were attempted.[15] Dr. Bradley first met with respondents to begin her analysis and educational CT Page 3601 work with respondents well after the adjudicative date in April 2001. The only real issue is whether events after the adjudicatory date establish "a degree of rehabilitation that is sufficient to foresee that the parents may resume a useful role in the child's life within a reasonable time." In re Stanley D., 61 Conn. App. 223, 230, 763 A.2d 83 (2000); Inre Latifa K., 67 Conn. App. at 749-50 (acknowledging that the court could take facts into account from beyond the adjudicatory period in making its decision in the adjudicatory phase with regard to whether the degree of rehabilitation was sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time.)
Rehabilitation must be foreseeable within a reasonable time. In reSheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." In re Stanley D., 61 Conn. App. at 231
(quoting In re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000). Here, for a child who has never lived with her parents and who now has the stability of a wonderful foster home and foster parents who would like to adopt her, the estimated length of time needed for rehabilitation of respondents even under the best of circumstances is not reasonable. And in this case, rehabilitation itself remains speculative and is contingent on numerous factors, including parenting and domestic violence classes, respondent father's resumption of his medication and individual therapy, all of which respondents have had three years to accomplish while Alexandra remained in DCF care.
The respondents have made significant improvements in their abilities to manage their own mental health issues and to manage their own lives. Respondents have come a long way from where they were when Alexandra was born in February 1999 in terms of their own mental health and stability. At the time of Alexandra's birth and in the months that followed, both respondents were laboring under the effects of severe psychiatric illness and both were suicidal to the point of requiring inpatient hospitalization. They demonstrated by the time of trial an ability to regularly visit with the child, to work and to remain psychiatrically stable. Neither had any hospitalizations since 1999. While they are to be commended for the improvements they have made, the court finds that they are not in a position to provide day to day care for their daughter or to assume a useful role in Alexandra's life and that they have not achieved rehabilitation as would encourage the belief that they will be in such a position within a reasonable time.
Even the testimony of respondents' expert, Dr. Bradley, supports the court's findings. In recommending a targeted intervention over the next 10 months, she implicitly acknowledged that at the time of trial respondents had not rehabilitated to the point where they were in a CT Page 3602 position to play a constructive role in the day to day care of their child. At the time of trial, they had been unable to meet Dr. Bradley's "absolutes" in that they had not sufficiently resolved their domestic violence issues and, significantly, respondent father continued to be non-compliant with individual therapy and medication. Even Dr. Bradley conceded that it would first take four months of compliance with individual therapy and medication and then, if that were successful, an additional six months of increasing visitation before reunification would be possible. Even then, reunification would only be possible if, during the 10-month period, the parents "did very, very well . . . and were very consistent with all of the recommendations." In her view this would require not missing a single appointment. There are too many conditions precedent required, even in Dr. Bradley's opinion, to warrant a finding by the court that within a reasonable time,[16] the respondents will be sufficiently rehabilitated such that they can play a constructive role in the life of the child.
The court is mindful that parents are not required to be "able to assume full responsibility for a child, without the use of available support programs." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802 (1984); In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). The fact that both parents require continued counseling is not the basis of the court's determination that they have not sufficiently achieved rehabilitation. See In re Jessica B.,50 Conn. App. 554, 564, 718 A.2d 997 (1998) (trial court's finding that respondent had failed to achieve rehabilitation was properly based on her inability to meet court-approved expectations, and not on her mental retardation); In re Jessica S., 51 Conn. App. 667, 672-74 (1999) (trial court properly found a failure to rehabilitate); In re Nicolina T.,9 Conn. App. 598, 606, 520 A.2d 639 cert. denied, 203 Conn. 804,525 A.2d 519 (1987) (trial court terminated parental rights not because of mental condition, but because of an inability to function as a parent). Although respondents have limitations that prohibit them from successfully parenting Alexandra without support, at the time of trial they were still not in a position t6begin reunification, even with supports. As Dr. Bradley concluded, there were a number of areas in which they would need weekly support. To reach that level, however, would require rehabilitation not yet achieved by respondents here. It is not simply a matter of both parents needing to continue counseling, it is a matter of respondents meeting the "absolutes" before the reunification process could begin.
In assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." In re Mariah S., 61 Conn. App. at 261; accord, In reCT Page 3603Gary B., 66 Conn. App. at 292; In re Amneris P., 66 Conn. App. 377,384-85, 784 A.2d 457 (2001). The issue is not whether respondents have improved their abilities to manage their own lives, but rather whether they have gained the ability to care for the particular needs of Alexandra. In re Shyliesh H., 56 Conn. App. 167, 180, 743 A.2d 165
(1999); In re Sarah Ann K., 57 Conn. App. at 448. while viewed as a resilient child and not one with special needs, nevertheless is a toddler who requires constant supervision and who needs and deserves a safe, stable and nurturing environment. Expressing love for a child and visiting with a child is vastly different from being able to care for the particular needs of a child on a day-to-day basis, even with supports in place. Alexandra has been in care her entire life with no real interaction with either of her parents until she was well over a year old. As Dr. Sadler stated, Alexandra deserves permanency as soon as possible. As Dr. Bradley also acknowledged, she deserves permanency "very soon."
As Judge Brenneman stated in In re Smanatha B., 45 Conn. Sup. 468,722 A.2d 300 (1997), aff'd, 51 Conn. App. 376, 721 A.2d 1255 (1998), "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe, permanent home with proven competent care-takers because her biological mother has tried hard but continues to be incapable of providing such a home for her." Here, respondents have tried to rehabilitate, but have done so insufficiently to be in a position to provide the day to day care this child needs within a reasonable time. Alexandra has lived for much of her young life with a loving foster family which is committed to her, with whom she has thoroughly bonded and which would like to adopt her.
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite their progress toward rehabilitation, respondents remain unable to successfully parent Alexandra and lack the' ability to assume a responsible position in Alexandra's life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved respondents' failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
III. DISPOSITION
As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including November 29, 2001, the date upon which the evidence in this matter was completed. "`If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During CT Page 3604 the dispositional phase, the trial court must determine whether termination is in the best interests of the child.' [In re Eden F.,250 Conn. at 689]." In re Quanitra M., 60 Conn. App. at 103. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [17a-112
(k)]." In re Jonathan G., 63 Conn. App. 516, 528 (quoting In re DenzelA., 53 Conn. App. 827, 833, 733 A.2d 298 (1999)). "The seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered."In re Quanitra M., 60 Conn. App. at 104. The court considers each of them in determining whether to terminate parental rights under this section. The court makes the following seven written findings:
(1) As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with respondent, the court finds that DCF offered many services to address domestic violence, parenting and mental health issues. Respondents availed themselves of some services at times, including visitation, and respondents did not avail themselves of other services, although they did obtain some services on their own.
(2) As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds by clear and convincing evidence that DCF made such efforts. (C.G.S. § 17a-112 (c)(1)) Moreover, on August 2, 2000, the court (Santos, J) made a finding that further efforts to reunify were no longer appropriate.
(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, the court finds specific steps were ordered as to respondent mother and father. As set forth above, there was compliance by both respondents as to some steps, but not as to others. (See p. 6-10, supra). DCF has fulfilled its obligations to facilitate reunification of the family.
(4) As to the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties, the court finds by clear and convincing evidence that Alexandra does have a bond with both respondents. She does recognize them as "Mommy and Daddy," and has enjoyed her visits with them. Alexandra also has strong emotional ties with the foster parents with whom she has lived since September, 2000. The evidence revealed that she has adjusted very well in that foster family that foster and the parents providing the CT Page 3605 day to day physical, emotional, moral and educational support she needs. The foster parents are committed to Alexandra and would like to adopt her.
(5) As to the age of the child, the court finds that Alexandra is now three years old. The Court further finds, as shown by clear and convincing evidence, that this child requires stability of placement and continuity of care and that the child's attorney recommends termination.[17]
(6) As to the efforts the pa Vent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; the court finds by clear and convincing evidence that although initially failing to do so for the first 15 months of her life, both respondents have since maintained contact with the child. The court further finds that despite significant efforts, respondents are unable to assume a responsible parental role in Alexandra's life. Giving them additional time would not likely enable them to adjust their circumstances, conductor conditions to make it in the best interest of the child to be reunited. In re Luis C. 210 Conn. 157 (1 989); In reJuvenile Appeal, 183 Conn. 11, 15 (1981). This is particularly true here where the testimony established that first, a four month period of monitoring compliance with medications and individual counseling would be necessary and that time period would have to be followed by an additional six months during which the parents did "very, very well," before reunification could occur.
(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that no unreasonable conduct by the child protection agency, foster parents or third parties is noted. DCF took many steps to facilitate reunification. Although counsel for respondents argue that it was unreasonable for DCF not to provide home visits, the court does not find this conduct unreasonable under the circumstances of this case.
Further, while the respondent's financial means were limited, economic factors did not prevent regular, continuing contact with the child. No CT Page 3606 unreasonable conduct by the child protection agency is noted.
With respect to the best interests of the child contemplated by C.G.S. § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Cynthia C. and Joseph G. is in the best interest of the child Alexandra C. Permanency, consistency and stability are crucial for Alexandra even though she has been described as a resilient child. She has already endured several changes in placement and is now in a foster home where she is thriving and very well cared for by foster parents who wish to adopt her. While respondents love their daughter and desire to care for her, they have been consistently unable to assume a responsible parental role regarding Alexandra. According to Dr. Sadler, even though respondents have made significant improvement in their abilities to manage their own lives, they are not in a position to provide day to day care for Alexandra, and respondent father is not in therapy or on medication.
In finding that termination of the respondent's parental rights would be in Alexandra's best interest, the court has examined multiple relevant factors including the child's interests in sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with her foster parents and biological parents; the degree of contact maintained with her biological parents; and her genetic bond to respondents.[18]In re Alexander C., 60 Conn. App. 555, 559, 760 A.2d 532 (2000); In reShyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000); In re SavannaM., 55 Conn. App. 816. The court has also balanced Alexandra's intrinsic needs for stability and permanency against the potential benefit of maintaining a connection with her biological parents. See Pamela B. v.Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). Under such scrutiny, the clear and convincing evidence in this matter establishes that termination of respondents' parental rights is in Alexandra's best interest. The Court agrees with counsel for Alexandra that she should not have to wait for permanency even though she is a resilient child. Alexandra is entitled to a resolution, without delay, of the long period of uncertainty as to the availability of respondents to serve as her functional parents, by terminating the respondents' parental rights.
After considering the child's sense of time, her need for a secure and permanent environment, the need to avoid future placements, and the totality of circumstances occurring since Alexandra's birth, the court concludes that termination of parental rights of respondents is in Alexandra's best interest. CT Page 3607
It is accordingly, ORDERED that the parental rights of Cynthia C. and Joseph G. are hereby terminated as to the child Alexandra C. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Alexandra C.
A permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court as required by law.
Judgment may enter accordingly.
It is so ordered this 22nd day of March, 2002.
 ___________________ Jongbloed, J.